# In the United States Court of Federal Claims

No. 08-905C

(Filed Under Seal: April 8, 2009)
(Reissued for Publication: April 17, 2009)[1]

```
*****************************************   *
                                            *
BLACKWATER LODGE & TRAINING                 *
CENTER, INC.,                               *
                                            *
                   Plaintiff,               *
                                            *
 v.                                         *    Post-award Bid Protest; Challenge to
                                            *    Navy's Evaluation of Competitive
                                            *    Proposals; Discretion Afforded to
UNITED STATES,                              *    Agency's Technical and Past
                                            *    Performance Evaluations;
                   Defendant,               *    Reasonableness of Best Value
and                                         *    Determination; Timeliness Issues.
                                            *
AUTOMATION PRECISION                        *
TECHNOLOGY, LLC,                            *
                                            *
                   Defendant-Intervenor.    *
                                            *
*****************************************   *
```

*Robert E. Korroch*, Williams Mullen, Newport News, Virginia, with whom was *Francis E. Purcell, Jr.*, Williams Mullen, McLean, Virginia, Of Counsel, for Plaintiff.

*Russell A. Shultis*, with whom were *Michael F. Hertz,* Acting Assistant Attorney General, *Jeanne E. Davidson,* Director, and *Bryant G. Snee,* Deputy Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Sharon Sachs*, Naval Air Warfare Center, Of Counsel, for Defendant.

---

[1] The Court issued this opinion under seal on April 8, 2009, and gave the parties until April 15, 2009 to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information. The Court received several proposed redactions from Plaintiff, but following a telephone conference with counsel on April 17, 2009, the Court indicated its preference to deny the proposed redactions, without disagreement from counsel. Accordingly, the decision is released in its entirety.

*William W. Goodrich, Jr.*,with whom were *Richard J. Webber*, *Lisa K. Miller*, and *Kavitha J. Babu*, Arent Fox LLP, Washington, D.C., for Defendant-Intervenor.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

In this post-award bid protest, Plaintiff Blackwater Lodge & Training Center, Inc. ("Blackwater") challenges the decision of the United States Department of the Navy ("Navy") to award a contract to Automation Precision Technology, LLC ("APT") for the Master-at-Arms Class "A" School to provide basic training to Naval personnel in the areas of antiterrorism, force protection, and small arms proficiency.  Blackwater is an experienced provider of weapons and tactical training to the military.  Following a post-award protest to the Government Accountability Office ("GAO") and the Navy's decision to amend the Solicitation and reevaluate proposals, the Navy awarded the contract to APT on August 8, 2008.  Blackwater submitted a second but unsuccessful protest to the GAO on August 22, 2008 and filed this action in our Court on December 18, 2008.  APT, the awardee and incumbent contractor, has intervened on Defendant's side.

Blackwater's protest focuses primarily on the Navy's evaluation and acceptance of APT's proposal for live-fire training in the use of the M-60 medium machine gun.  The Solicitation called for the awardee to provide 33 days of instruction, but only one day would involve "live-fire" training in the use of the M-60 machine gun.  APT offered to provide the M-60 machine gun training at the Government-owned Fort Pickett firing range in Blackstone, Virginia.  Blackwater argues that the Navy's award to APT was arbitrary and capricious because APT's M-60 firing range proposal failed to comply with material requirements in the Solicitation.  These requirements were that: (1) all training take place within the Norfolk, Virginia Fleet Concentration Area, and (2) all offerors provide a letter of agreement or contract confirming their authorization to use firing ranges owned by third parties.  Blackwater also asserts that the Navy's technical evaluation did not account for two critical weaknesses in APT's offer to use Fort Pickett: (1) the risk that APT would be bumped from the firing range by a higher priority user, and (2) the impact that a long commute to the firing range would have on training.  Beyond its objection to APT's M-60 firing range proposal, Blackwater claims that the Navy improperly evaluated APT's past performance record by failing to downgrade APT's rating for past safety incidents.  Finally, Blackwater alleges that the Navy conducted an improper "best value" determination by ignoring its technical superiority to APT, and according more weight to the price factor than the Solicitation permitted.

For the reasons stated below, the Court concludes that Blackwater's protest is without merit. While Blackwater raises multiple protest grounds, its challenges to the Navy's award decision generally amount to mere disagreement with the Navy's reasonable technical and past performance evaluations.  The Court finds nothing in the Administrative Record to suggest that the Navy acted arbitrarily or capriciously in evaluating APT's proposal or in making its "best value" determination. This Court gives deference to the Navy's technical and past performance ratings and will not substitute its judgment for that of the Navy if its decision is reasonable. <u>See, e.g.</u>, <u>E.W. Bliss Co.</u>

v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004). Accordingly, Defendant's and Defendant-Intervenor's motions for judgment on the Administrative Record are GRANTED, and Plaintiff's cross-motion for judgment on the Administrative Record is DENIED.

Background

A. The Solicitation

On April 23, 2007, the Naval Air Warfare Center Training System Division issued Solicitation No. N61339-07-R-0039 seeking proposals for the Master-At-Arms ("MAA") Class "A" School for naval personnel in the Norfolk Fleet Concentration Area ("FCA"). Administrative Record ("AR") 1, 6. The Solicitation called for a fixed-price indefinite delivery, indefinite quantity ("IDIQ") contract with a one-year base period and four one-year options. AR 5, 9.

Under the "Training Requirements" section of the Statement of Work ("SOW"), the Solicitation described the MAA Class "A" School training program's purpose to "provide[] apprentice level skills in the areas of antiterrorism, force protection, including, but not limited to Pier Security; Harbor Security; Force Protection Conditions; Physical Security Safeguards; Apprehensions; Search and Seizure; Use/Application of Force; Confrontation Management; and small arms proficiency." AR 8. The SOW further stated that "training will be conducted in the Norfolk, VA, FCA." AR 6. The Solicitation described the hours of training as follows:

> Training shall normally be conducted eight hours a day (early, evening, or night shift), five days a week for the length of the course. These eight hours are actual training time, and should not include meals. However, the daily activity may range from 9 to 12 hours or more if required to meet all training objectives outlined in the curriculum. Student remediation is required and should be considered beyond the normal 8 hour training time for each class. During execution of the class schedule where holidays or any other event that impacts the expeditious movement of Sailors through the training pipeline occurs, the training activity may extend the number of daily training hours to compensate.

AR 10.

The Training Course Control Document ("TCCD"), appended as Attachment A to the SOW, contained detailed requirements for all aspects of the course. AR 73-207. According to the TCCD, the course would comprise 45 calendar days of 33 instructional days and 260 instructional periods. AR 80. The Course Master Schedule, Annex B to the TCCD, indicated that seven of the 33 instructional days would be designated for non-classroom, "live-fire" training at a firing range. AR 171-82. The firing range training included Small Arms fire of the M-9 pistol, 12-gauge shotgun, M-16 rifle, and M-60 medium machine gun. AR 8. Of the live-fire training days, only one day was

allocated for the M-60 medium machine gun.  AR 177.  The contractor would be responsible for providing suitable range facilities for all live-fire training.  AR 13.  To that end, the Solicitation, as amended, required the offeror to "[p]rovide a plan for obtaining the use of the necessary ranges/classroom . . . ," including "Letters of Agreement or contracts with the offeror and the proposed range . . . ."  AR 1701-02.  The Solicitation also stated that "[a] letter of intent or actual agreement for use of ranges and classrooms not owned by the contractor shall be provided . . . prior to [the Navy Occupational Safe and Health Officer's] inspection of the ranges . . .," which must occur "by the end of the mobilization phase."  AR 1656.

The Solicitation called for training to take place on a "turn-key" basis, meaning that the contractor would provide the facilities, equipment, weapons, ammunition, consumables, and logistical support.  AR 11.  The Solicitation also required contractors to provide daily transportation for students to and from the pick-up point of the respective Navy bases and around the contractor's facilities.  Id.  The Solicitation stated further that "[i]t is highly desirable that contractor facilities are located within one-hour driving distance from the main gates or student pick-up point of the FCA base."  Id.  Additionally, the Solicitation mandated that the contractor provide a lunch to students every day and dinner if the training extended past 5:00 PM.  AR 13.  "In the event that 'live fire' evolutions [took] place geographically separate from the contractor's facilities," the Solicitation required the contractor to "take appropriate action to provide box lunches . . . ."  Id.

B.  Method of Evaluating Proposals

The Solicitation set forth evaluation criteria by which the Navy's Source Selection Evaluation Board ("SSEB") would review and rate the contractors in three main areas: (1) Technical/Management, (2) Past Performance, and (3) Price.  AR 67-71.  The Solicitation stated that "Technical/Management is significantly more important than Past Performance, and Past Performance is more important than price."  AR 67.

1.  Technical/Management

Under the area of Technical/Management, the Solicitation provided three factors of equal importance: (1) Technical Understanding, (2) Technical Capability, and (3) Management/ Management Structure.  Id.  The Solicitation explained:

> Within the Technical/Management Area, Factors are of equal importance unless one of these Factor(s) is evaluated as Unsatisfactory or, depending on the deficiency, Marginal, in which case the Area could also be rated as Unsatisfactory or Marginal.  The government will not average or balance Unsatisfactory or Marginal Factor ratings with higher ratings, but will use a subjective analysis based on factual data to determine the Area ratings.

AR 67.  The Technical Understanding factor contained three subfactors: (1) course understanding, (2) technical references, and (3) program risk.  AR 67-68.  The Technical Capability factor included five subfactors: (1) instructor qualifications, (2) equipment support, (3) recruitment and retention, (4) mobilization plan, and (5) transition plan.  AR 68.  Finally, the Management/Management Structure factor contained five subfactors: (1) management experience, (2) organizational structure, (3) instructor management, (4) small business participation plan, and (5) subcontracting plan.  AR 69.

The Solicitation provided that each contractor would be assessed and assigned an "adjectival rating" and a "risk rating" for each of the three factors within the Technical/Management area.  AR 71.  The adjectival rating given to a contractor's proposal was referred to as the Technical Merit Adjectival Rating and "[i]ndicate[d] how well the offeror's proposal [met] the requirements of the solicitation."  Id.  The adjectival ratings for assessing the Technical/Management merit of an offeror's proposal employed the following definitions:

| Technical Merit Adjectival Rating | Definition |
|---|---|
| Outstanding | Proposal significantly exceeds requirements in a way that benefits the Government or meets requirements and contains at least one exceptional enhancing feature, which benefits the Government.  Any weakness is minor. |
| Highly Satisfactory | Proposal exceeds requirements in a way that benefits the Government or meets requirements and contains enhancing features, which benefit the Government.  Any weakness is minor. |
| Satisfactory | Proposal meets requirements.  Any weaknesses are minor and will have little or no impact on contract performance. |
| Marginal | Proposal contains weaknesses or minor deficiencies, which could have some impact if accepted. |
| Unsatisfactory | Proposal does not comply substantially with requirements. |

Id.

The risk rating, referred to as the Proposal Risk Rating, "[a]ssesse[d] the risk associated with the offeror's proposed approach as it relate[d] to accomplishing the requirements of the solicitation."  Id.  The risk ratings employed the following definitions:

| Proposal Risk Rating | Definition |
|---|---|
| Low | Has little or no potential to cause disruption of schedule, increase in cost, or degradation of performance.  Normal contractor effort will probably be able to overcome difficulties. |
| Medium | Can potentially cause some disruption of schedule, increase in cost, or degradation of performance.  However, special contractor emphasis will probably be able to overcome the difficulties. |
| High | Likely to cause significant serious disruption of schedule, increase in cost, or degradation of performance even with special contractor emphasis. |

Id.

      2.  Past performance

In the second main area, Past Performance, the SSEB would evaluate the offeror's ability to perform the contract requirements based on both the offeror's and the proposed subcontractors' record of past and current performance.  AR 69.  The Solicitation stated:

> Each offeror (including subcontractor(s)) will be evaluated on its past performance on contracts or subcontracts currently ongoing or completed within the last three years for similar products or services.  A past performance risk will be associated with an offeror's ability to accomplish the requested effort based on the offeror's relevant demonstrated past performance and systemic improvement.  The evaluation will assess such areas as relevancy (in complexity, size and scope) to the requirement; quality of product or service; schedule and cost control; personnel retention; and business and customer relationships. Emphasis will be placed on the past performance of the prime offeror, but any subcontractor past performance will also be considered important.

Id.  The Solicitation explained that past performance data would be obtained through information requested in Section L, Contractor Performance Assessment Rating Systems, similar systems used by other Government agencies, questionnaires, Defense Contract Management Agency channels, and interviews with program managers and contracting officers, among others. AR 70. The Government could elect to consider data from other sources, but the offeror had the burden of proving that its past

performance was acceptable.  Id.  Furthermore, the Solicitation emphasized that the Government would consider trends in an offeror's performance:

> (C) The Government does not expect an offeror's past performance to be perfect.  However, the Government does seek offerors that demonstrate the ability to isolate past and present problems down to a root cause and to take systemic improvement management actions to resolve the root cause of the problems.  Offerors should be able to demonstrate their application of systemic improvement management practices used to resolve past and present performance problems, as well as present the systemic improvement management approach to be used during execution of the proposed contract.

Id.  The Solicitation identified the following definitions to rate past performance:

| Performance Risk Rating | Definition |
|---|---|
| Very Low | Based on the offeror's experience or past performance, essentially no doubt exists that the offeror will successfully perform the required effort. |
| Low | Based on the offeror's experience or past performance, little doubt exists that the offeror will successfully perform the required effort. |
| Moderate | Based on the offeror's experience or past performance, some doubt exists that the offeror will successfully perform the required effort. |
| High | Based on the offeror's experience or past performance, substantial doubt exists that the offeror will successfully perform the required effort. |
| Very High | Based on the offeror's experience or past performance, extreme doubt exists that the offeror will successfully perform the required effort. |
| Unknown | No performance record is identifiable.  This applies only to Past Performance. |

AR 72.

### 3. Price and administrative

In the third main area, Price and Administrative, the SSEB would evaluate a proposal for "total price, reasonableness, materially unbalanced pricing of the requirements, and completeness." AR 70.

### 4. FAR procedures

The Navy's Source Selection Plan provided that the procedures identified in Federal Acquisition Regulation ("FAR") Part 15 would govern the selection process. AR 210. FAR Part 15 sets forth policies and procedures governing competitive and noncompetitive negotiated acquisitions. FAR 15.000 (2009). The Source Selection Plan stated that the Government would "select a responsible offeror whose proposal, conforming to the solicitation, is most advantageous to the Government, price and other factors considered." AR 210. The acquisition would be conducted on a full and open competitive basis. Id.

### C. Submission and Evaluation of Initial Proposals

After issuing the Solicitation, the Navy responded to a number of questions from prospective offerors, including one regarding the "preferred location and/or military installation" where training would take place. AR 254. The Navy stated that the "[c]ourse will be taught at the vendor's facility, which must be located in the Norfolk FCA, and within a one hour rush hour commute from NAS Oceana Annex Dam Neck." Id. The Navy simultaneously amended the SOW to specify that the point of origin for transportation pick-up was the Naval Air Station Oceana Annex, Dam Neck, Virginia. AR 256. The SOW retained the language stating that it was "highly desirable that contractor facilities are located within one-hour driving distance" from the student pick-up point. Id.

The Solicitation required offerors to submit proposals by May 30, 2007. AR 252. The Navy received a total of four proposals. AR 849, 1331. Blackwater submitted its initial proposal on May 29, 2007 offering a total price of $28,857,572.63. AR 259-585, 849. Blackwater's proposal provided that all training would occur on its property in Moyock, North Carolina, just south of the Virginia border. AR 269-70. On May 30, 2007, APT, the incumbent contractor currently providing MAA training, submitted its proposal offering a total price of $16,958,968. AR 587-726, 849. APT's proposal accommodated most of the training at its facility in Norfolk, Virginia, less than 30 minutes from the designated pick-up point. AR 597. However, APT's training for the M-60 medium machine gun would take place at an off-site firing range rented from a third party and located 60 minutes from the designated pick-up point. AR 633. APT provided with its proposal a Letter of Agreement signed by the lessor. AR 702.

On June 25, 2007, the SSEB evaluated Blackwater's and APT's initial proposals. AR 848-73. Both offerors received Highly Satisfactory/Low Risk evaluations in the Technical/Management area. AR 853, 858. The SSEB's technical evaluation of APT identified the use of a third party firing

range as a weakness, explaining that APT had "not provided any further information as to whether the range [was] certified for the M60. This is detrimental in that if the range hasn't been certified for M60 use for schoolhouse training, the offeror will be unable to use the range to teach the crew served weapons module of the course." AR 856. In the Past Performance area, Blackwater earned a Very Low risk rating, meaning that "essentially no doubt exist[ed] that the offeror [would] successfully perform the required effort." AR 72, 862. Due to safety concerns raised in the course of evaluation, APT received a Moderate risk rating, meaning "some doubt exist[ed] that the offeror [would] successfully perform the required effort." AR 72, 857. The SSEB recommended that the Navy issue an Evaluation Notice to APT to allow the offeror to respond to the safety concerns. Id.

On July 19, 2007, the Procuring Contracting Officer ("PCO") issued a Competitive Range Determination finding that all four offerors fell within the competitive range, including Blackwater and APT. AR 1090-92. The Competitive Range Determination concluded that further discussions with the offerors were necessary because: (1) the Government had revised the SOW to add language indicating that the firing range had to be capable of supporting M-60 live-fire without utilizing suppressors, and (2) significant proposal deficiencies existed that needed to be resolved prior to contract award. AR 1090.

On August 14, 2007, the Navy issued an amendment to the Solicitation modifying the firing range requirements to state: "[t]he range shall have the capability of supporting the M-60 'live-fire' segment of the crew served weapons training without utilizing suppressors for noise abatement. Suppressors should not be used on the M-60 medium machine gun." AR 1101.

On that same day, the PCO sent an Evaluation Notice to APT requesting the offeror to address areas of concern in its proposal. AR 1128-32. First, the Evaluation Notice asked APT to provide information confirming that it had secured a firing range that met the Navy's requirements for the M-60 machine gun and that the range would be certified by the Center for Security Forces prior to the end of the mobilization phase. AR 1130-31. Second, the Evaluation Notice requested APT to respond to safety concerns regarding the current MAA contract. AR 1131. The Evaluation Notice described three incidents to be addressed: (1) an explosive mishap of a 12-gauge shotgun in March 2005, (2) the discharge of a 9mm round during a classroom training demonstration in May 2007, and (3) the submission of a Training Observation Report by an officer with the Center for Security Forces questioning the maintenance of M-60 medium machine guns used by APT. Id. The Evaluation Notice also sought information about the armory procedures APT would teach the students, why APT had not met the Defense Department's mandatory Small Disadvantaged Business goal of 5 percent, and additional data supporting APT's proposed price. AR 1130-32.

On August 16, 2007, the PCO sent APT a revised Evaluation Notice again asking APT to provide information confirming that its proposed firing range would meet the M-60 machine gun requirements and be certified by the Center for Security Forces prior to the end of mobilization and addressing its safety concerns. AR 1141-44.

On August 24, 2007, APT responded to the concerns addressed in the PCO's Evaluation Notices. AR 1172-94. APT stated that its indoor firing range had been certified by the Center for Security Forces and that APT had entered into an agreement with another company to use its firing ranges to meet the M-60 machine gun requirements. AR 1188. According to APT, the facility was located one hour and fifteen minutes from the Dam Neck Naval Facility. Id. APT responded to the safety concerns by providing a list of its safety policies, checklists, and procedures, and addressing each safety incident individually. AR 1189-91. With respect to the March 2005 explosive mishap, APT explained that its internal investigation revealed that the incident resulted from defective ammunition. AR 1191. Following the incident, APT reported the explosion to the ammunition manufacturer and received the manufacturer's assurances that it would implement stricter quality controls. Id. APT also stated that it had begun testing all ammunition prior to allowing students to shoot and had set a goal of reporting any firing mishap to the Training Site Manager within fifteen minutes. Id. In response to the accidental discharge of the 9mm round in a classroom in May 2007, APT disclosed that it had instituted a policy prohibiting instructors from possessing functional weapons or ammunition at any location other than the firing range. Id. Finally, APT addressed the PCO's criticisms of its M-60 maintenance practices by explaining that it had arranged for its employees to obtain additional training to bring its future maintenance practices into compliance with manufacturer specifications. Id. APT submitted its final proposal on September 14, 2007. AR 1312.

The PCO also sent two Evaluation Notices to Blackwater on August 14 and 15, 2007 requesting it to address concerns about its proposal. AR 1134-36, 1138-39. The Evaluation Notices asked Blackwater to provide: (1) a rationale for not meeting the Defense Department's mandatory Small Disadvantaged Business goal of 5 percent, (2) mobilization data clarifying how Blackwater arrived at its proposed price, and (3) a revised subcontracting plan. AR 1136, 1139. Blackwater engaged in discussions with the PCO in accordance with the Evaluation Notices and submitted its final proposal on September 12, 2007. AR 1294.

D. Evaluation of Final Proposals

On November 19, 2007, the SSEB issued its Final Proposal Evaluation Report for the MAA Class "A" School Solicitation. AR 1314-1339. APT and Blackwater again received Highly Satisfactory/Low Risk evaluations in the Technical/Management area. AR 1316-17, 1319-20. In the Past Performance area, Blackwater once again earned a Very Low risk rating. AR 1320-21. However, the SSEB upgraded APT from a Moderate to a Low risk rating, meaning that "little doubt exist[ed] that the offeror [would] successfully perform the required effort." AR 1318. In weighing the two proposals, the SSEB found them "evenly matched technically, with each offering benefits that exceed the government's requirement." AR 1330. Furthermore, the SSEB stated that "[t]here is no relative advantage to Blackwater or APT regarding these proposed strengths and neither offeror's proposal contained any weaknesses or deficiencies." Id. The SSEB noted that APT's revised price of $21,270,591.00 was approximately 22.4 percent lower than Blackwater's revised price of $27,421,318.71. Id. After confirming that "past performance is more important than price," the SSEB concluded that, "on a best value basis, APT's proposed price advantage far out weights

[sic] the difference in past performance especially since APT currently teaches the MAA course as the incumbent and little doubt exists that APT will successfully perform this effort." Id.  The SSEB then recommended awarding the contract to APT.  Id.

On November 23, 2007, the Source Selection Authority ("SSA") issued a Source Selection Decision Memorandum affirming the SSEB's recommendation.  AR 1332-39.  The Memorandum stated:

> Taken as a whole, the SSA concurs with the SSEB's assessment that there is no relative advantage of one technical proposal over the other. Accordingly, the award decision primarily falls to consideration of the Past Performance and Price Areas.  Blackwater's "Very Low" past performance risk rating is superior to APT's rating of "Low."  However, the degree of superiority is lessened since APT is the incumbent contractor currently performing the MAA course, and its proposal and response to the discussions reflect systemic improvements to resolve the quality and safety concerns with its past performance.  The SSA concurs with the SSEB's assessment that the substantial price advantage of the APT proposal far out weighs [sic] the difference in past performance risk between the offerors, given that I view the technical proposals of each offeror as being technically equivalent.  Accordingly, the APT's proposal is considered the best value.

AR 1339.  On December 7, 2007, the Navy informed Blackwater that it had awarded the contract to APT.  AR 1509.

### E.  Blackwater's First GAO Protest and the Navy's Corrective Action

Following a debriefing conducted by the Navy, Blackwater filed a protest of APT's contract award with the GAO on December 20, 2007.  AR 1527-29.  Blackwater alleged that APT's proposal failed to conform to material requirements of the Solicitation because the firing range for the M-60 machine gun training was incapable of handling ammunition necessary for the MAA course.  AR 1527-29.  In response to Blackwater's protest, the Navy informed the GAO by letter dated January 15, 2008 of its intent to amend the Solicitation to clarify the ammunition requirements, reopen negotiations, obtain and evaluate revised proposals, and make a new source selection decision.  AR 1537.  The GAO dismissed Blackwater's protest as academic on January 29, 2008 due to the Navy's plan to take corrective action.  AR 1539-40.

On March 6, 2008, the Navy issued Amendment 0006 to the Solicitation, revising the SOW as follows:

> **3.13.4 Ranges.**  The contractor shall provide suitable range facilities to support all "live fire" evolutions contained within the course curriculum.

These range facilities must be suitable for supporting small arms weapons qualification and training involving the M-9 pistol, M-16 rifle, and the M500 shotgun.

In addition, suitable facilities to support crew served weapons training using the M-60 medium machine gun must also be provided. Per OPNAVINST 3591.1 (series), "live fire" ranges for Crew Served Weapons must not be less than 100 meters with a 2′ X 2′ area target. This restriction is based on weapon design. The range shall have the capability of supporting the M-60 "live fire" segment of the Master-At-Arms training without utilizing suppressors for noise abatement. Suppressors shall not be used on the M-60 medium machine gun. In accordance with the RRL, Appendix A to the TCCD and notwithstanding any reference in OPNAVINST 35.91.1 (series) to the contrary, the contractor shall use 7.62mm linked ball ammunition for the M-60 medium machine gun "live fire" segment of the Master-At-Arms training.

AR 1558. The PCO sent letters to offerors within the competitive range notifying them that the Navy would conduct exchanges with the offerors on March 10 and 11, 2008. AR 1542-44, 1546-47. In an accompanying Evaluation Notice to APT, the PCO informed the offeror that the firing range it had proposed, which permitted only short-range training ammunition for machine guns and rifles up to 7.62mm, did not meet the "7.62mm linked ball" ammunition requirement for the M-60 live-fire portion of the MAA course. AR 1544. The Evaluation Notice requested APT to provide information confirming that it would have a range meeting the requirements for the M-60 course prior to the end of the mobilization phase. Id. On March 15, 2008, APT responded to the Evaluation Notice with a proposal to use a firing range at Fort A.P. Hill, a United States Army range in Virginia, for the M-60 course in live-fire training. AR 1608. APT also proposed a backup range at the Naval Surface Warfare Center in Dam Neck, Virginia "when it [was] available." AR 1609.

In a second Evaluation Notice dated May 15, 2008, the PCO requested APT to respond to concerns about the Fort A.P. Hill firing range, because military operational and tactical training would take priority over the MAA live-fire training program and threaten to "bump" APT from the range. AR 1738. The Evaluation Notice also noted that Fort A.P. Hill was approximately 147 miles, or a three-hour drive, from the student pick-up point, which fell "significantly outside the 'highly desirable' parameter of one (1) hour driving distance from the main gate or student pick-up point of the FCA base as stated in SOW paragraph 3.13.1." Id. The PCO explained that "[t]his poses a potential safety concern due to the travel distance which can cause unnecessary fatigue and lack of attention to detail while on the firing line . . . ." Id. The proposal to teach certain course topics on the bus en route to the range also raised concerns because some of the topics were hands-on and not conducive to learning on a bus, while others were safety-related and required a distraction-free environment. Id. Finally, the Evaluation Notice asked APT to provide the "Letter of Agreement or contract for the use of the range as requested by Section L(d)(1) Factor 2(B) of the RFP." AR 1739. The Navy conducted telephone conferences with APT on May 19 and 20, 2008. AR 1736.

APT revised its proposal in response to the two Evaluation Notices. AR 1756-76. On May 29, 2008, APT notified the Navy that it had secured a firing range at Fort Pickett Training Center in Blackstone, Virginia that supported 7.62mm linked ball ammunition. AR 1759. APT also submitted documentation from Fort Pickett confirming that sufficient ranges existed at the facility where live training could be conducted. AR 1767-76. These documents included a memorandum from Lieutenant Colonel ("LTC") David B. Weisnicht, Chief, Plans, Training and Security Division at Fort Pickett, authorizing APT to schedule use of Fort Pickett's M-60 firing range in conjunction with its duties and responsibilities under the contract. AR 1769. APT also provided a copy of email correspondence between LTC Weisnicht and APT official Walter Brown in which Mr. Brown stated: "My understanding of your comments is that as long as our training staff does not insist on being booked on a particular range, getting a range that is capable of satisfying [APT's] machine gun qualification requirements will not be a problem. Since there are several ranges on Fort Pickett that can be used for this type of training, the chance of being 'bumped' is negligible and should not be a concern." AR 1768 (emphasis in original). LCT Weisnicht responded "**Yes your understanding is correct. We have open ranges here every day.** National Emergencies, deployments, have priority and could mean bumping. I hope this helps." AR 1767. (emphasis in original).

Fort Pickett is located 133 miles from the student pick-up point. AR 1829. The estimated driving time is 2-1/2 hours. Id. In response to the Navy's concerns about driving time and distance, APT submitted an itinerary for the M-60 live-fire training day in which total training and travel time would take no more than twelve hours. AR 1760-61. Instructors would review topics previously taught in the classroom during the commute to the range, students would receive 5-1/2 hours of live-fire training at the range, and instructors would reflect on the firing range training during the commute back to the pick-up point. Id.

Blackwater also received an Evaluation Notice from the PCO on May 15, 2008 requesting the offeror to provide additional information about its price proposal. AR 1741-43. The Navy held telephone conferences with Blackwater on May 19 and 20, 2008, and Blackwater responded to the Evaluation Notice in writing on May 28, 2008. AR 1741, 1745-52. On June 19, 2008, the Navy sent letters to offerors within the competitive range notifying them that discussions regarding the contract had closed and requesting submission of final proposal revisions by June 27, 2008. AR 1778, 1780. Blackwater and APT submitted their final proposal revisions on June 23, 2008 and June 27, 2008 respectively. AR 1810, 1815-23.

F.  Evaluation Following Corrective Action

On July 10, 2008, the SSEB issued a Proposal Evaluation Report recommending that the SSA award the contract to APT. AR 1825-54. The SSEB assigned Blackwater and APT technical adjectival ratings of Highly Satisfactory and past performance ratings of Very Low and Low respectively. AR 1851. Blackwater and APT submitted the two lowest prices within the pool of offerors, but Blackwater's price, at $22,195,142.34, was approximately 10 percent higher than APT's price of $20,179,016. AR 1852. In its analysis, the SSEB noted that all of APT's facilities except the M-60 live-fire range were situated within the "highly desirable" driving distance and that APT

had provided a plan to mitigate the risk associated with the extended drive time to the M-60 firing range by setting forth a training schedule that could take place in a twelve-hour period and offering an alternate range that met the Solicitation requirements.[2]  Id.  Still, the SSEB found that:

> Blackwater ha[d] a slight relative advantage over APT in that Blackwater [did] not have any risk of being bumped from any range since they own their ranges and all of the training will occur on a single site that is within the "highly desirable" one hour driving distance from the student pickup point.

Id.  The SSEB reiterated that past performance was more important than price and acknowledged that Blackwater had received the higher past performance rating.  Id.  However, the SSEB explained that APT had mitigated the Navy's concerns about two of the safety incidents that had led to its Low past performance rating – an accidental discharge of a 9mm round and an incident in which suppressors came off the barrel of an M-60 machine gun – by adopting new safety policies and procedures.  Id.  The SSEB did not comment on the March 2005 explosive mishap involving a 12-gauge shotgun in its overall recommendation but did address the incident in its past performance area summary of APT's proposal.  Id.; AR 1832-33.  The SSEB concluded that "[o]n a best value basis, APT's proposed price advantage would out weigh [sic] Blackwater's slight relative advantage regarding the M60 range and the difference in past performance."  Id.

On August 1, 2008, the SSA considered and affirmed the SSEB's recommendation to award the contract to APT.  AR 1856-66.  The SSA concurred with the SSEB's decision to narrow the field of offerors to Blackwater and APT because they represented "technically superior, comparable past performance and lower priced offers" than the other two offerors.  AR 1863.  In weighing the two remaining proposals, the SSA noted that APT's and Blackwater's proposals had the same rating in the Technical/Management area, with each offering benefits that exceeded the Government's requirements and possessing "unique strengths."  AR 1864-65.  Two of Blackwater's unique strengths were its ability to provide all of the training at a single site, and within the "highly desirable" 60 minute driving distance.  AR 1864.  However, the SSA noted that APT also provided all training requirements at a single site within the "highly desirable" driving distance except for the one day of M-60 training.  Id.; AR 1832-33.  The SSA described the two technical approaches as "relatively the same" because "the M60 live fire training comprises only one day of the 33 day training course and, although long, that single training day still falls within the RFP allowable 12 hour training day time frame."  Id.

Taking the proposals as a whole, the SSA agreed with the SSEB's assessment that Blackwater's Technical/Management proposal provided only a slight relative advantage regarding the M-60 range.  AR 1865.  The SSA acknowledged the difference in past performance ratings but

---

[2] The SSEB's statement that APT had offered an alternate range meeting the Solicitation requirements was incorrect.  The SSA later submitted a declaration to the GAO disclosing this mistake but concluded that the mistake was minor and did not affect his best value determination.  AR 1949.

found that "the magnitude of difference between [them] is not appreciable, since APT is the incumbent contractor currently performing the MAA course, and its proposal and response to discussions reflect systemic improvements to resolve the quality and safety concerns with its past performance." Id. Furthermore, the SSA concurred that the substantial price advantage of APT's proposal more than outweighed the slight difference in the technical/management proposals and the minor difference in past performance risk. Id. The SSA concluded that "[a]lthough the APT proposal include[d] a long, single day of training for the M60 live fire requirement, the impact of such inconvenience [was] not deemed of sufficient value to offset the significant price difference between the proposals." Id. Accordingly, the SSA found APT's proposal to be the best value for the Government. Id.[3]

### G. Blackwater's Second GAO Protest

On August 8, 2008, the Navy notified Blackwater of its decision to award the contract to APT. AR 1897. Blackwater submitted a timely request for an agency debriefing, which the Navy conducted on August 18, 2008. AR 1899-1910. On August 22, 2008, Blackwater filed a second protest with the GAO consisting of six counts. AR 1912-44. After dismissing two counts as untimely, the GAO issued a decision on November 10, 2008 denying Blackwater's protest on the remaining four counts. AR 2429-34 (Blackwater Lodge and Training Center, Inc., B-311000.2 et. al., Nov. 10, 2008).

### H. Blackwater's Protest in This Court

On December 18, 2008, Blackwater filed a nine-count complaint in the Court of Federal Claims (1) seeking an order cancelling award of the contract to APT and directing the Navy to reopen the Solicitation, and (2) requesting bid preparation and proposal costs. APT filed a motion to intervene, which the Court granted on December 22, 2008. The Court received the Administrative Record on January 16, 2009. Defendant and APT filed their Motions for Judgment on the Administrative Record on February 5, 2009. Blackwater submitted its Response and Cross-Motion for Judgment on the Administrative Record on February 26, 2009, to which Defendant and APT replied on March 6, 2009. The Court heard oral argument on the cross-motions for judgment on March 12, 2009.

---

[3] The SSA also considered whether APT's proposal received a pricing advantage because APT was not required to pay for the cost of the firing range at Fort Pickett. AR 1865-66. Even after applying a price adjustment to APT's price for the rental value of the firing range, the SSA found that APT's proposal still had a considerable price advantage that would not displace APT as the best value offeror. AR 1866.

Discussion

A.  Jurisdiction and Standard of Review

The Court of Federal Claims has jurisdiction to review pre-award and post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006), as amended by the Administrative Dispute Resolution Act of 1996,  Pub. L. No. 104-320, § 12(a)-(b) (1996).

When resolving cross-motions for judgment on the administrative record, a court reviews an agency's action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A) (2006) (incorporated by reference in 28 U.S.C. § 1491(b)(4)); Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  A reviewing Court may only set aside the agency action if there has been a "clear and prejudicial" violation of the law, or the agency's action lacks a rational basis.  Centech Group, Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (2001)); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 13230-31 (Fed. Cir. 2004).  Thus, the Court's standard of review in bid protests is "highly deferential."  Advanced Data Concepts, Inc., 216 F.3d at 1058; Rust Constructors, Inc. v. United States, 49 Fed. Cl. 490, 493 (2001).

Courts grant procuring officials broad discretion in the conduct of procurements because of the "strong presumption that government officials act correctly, honestly, and in good faith when considering bids."  Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320 (2000) (citing Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 42 (1997)); see also Maintenance Eng'rs v. United States, 50 Fed. Cl. 399, 412 (2001) (citations omitted).  A reviewing court, therefore, "may not 'substitute its judgment for that of the agency' if the agency's decision is reasonable."  Benchmade Knife Co., Inc. v. United States, 79 Fed. Cl. 731, 735 (2007) (quoting R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).  "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ."  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir.1971)).  "Agency technical evaluations, in particular, should be afforded a greater deference by the reviewing court."  Benchmade Knife Co., Inc., 79 Fed. Cl. at 735 (citing E.W. Bliss Co., 77 F.3d at 449; Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 578 (2002)).

A disappointed bidder bears the burden of proving error sufficient to justify relief. Maintenance Eng'rs, 50 Fed. Cl. at 410 (citations omitted).  To prevail, the protestor must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996).  The disappointed bidder's burden is elevated where the solicitation contemplates award on a "best value" basis.  See Galen Med. Assocs., 369 F.3d at 1330 (citing E.W. Bliss. Co., 77 F.3d at 449).  In reviewing cross-motions

for judgment on the administrative record, the Court must determine "whether[t], given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc., 404 F.3d at 1356). Where necessary, the Court will make findings of fact. Id. (citing Bannum, Inc., 404 F.3d at 1356). "The resolution of cross-motions for judgment under Rule 52.1 is akin to an expedited trial on 'the paper record.'" CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (2007), aff'd, 552 F.3d 1351 (2008) (quoting A&D Fire Prot., Inc., 72 Fed. Cl. at 131). Thus, the inquiry made by the Court is whether the plaintiff has shown that the agency's decision was arbitrary, capricious, or contrary to law. Tech Sys., Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (citing CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 119 (2000)).

B. Timeliness of Blackwater's Protest

Defendant and APT request the Court to dismiss Count I of the complaint as untimely because Blackwater did not challenge the terms of the Solicitation prior to the closing date for receipt of proposals. Blackwater alleges in Count I that the Navy failed to comply with a material requirement of the Solicitation that training take place in the "Norfolk, VA, FCA" when it accepted APT's proposal to conduct the M-60 live-fire training course at Fort Pickett in Blackstone, Virginia. According to Defendant and APT, Blackwater's interpretation of "Norfolk, VA, FCA" as excluding Blackstone, Virginia creates a patent ambiguity on whether the Solicitation "required" or deemed it "highly desirable" that the M-60 live-fire training occur within the "Norfolk, VA, FCA."

A disappointed bidder must seek clarification of any Solicitation terms containing patent errors prior to the closing of the bidding process. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007); see also Benchmade Knife Co., Inc., 79 Fed. Cl. at 737; Erinys Iraq Ltd. v. United States, 78 Fed. Cl. 518, 533 n.7 (2007); Scott v. United States, 78 Fed. Cl. 151, 154 n.2 (2007); Moore's Cafeteria Servs. v. United States, 77 Fed. Cl. 180, 185 (2007).

Here, however, Blackwater does not allege that the term "Norfolk, VA, FCA" contains a patent ambiguity. Rather, Blackwater asserts that the requirement for training to be conducted in the "Norfolk, VA, FCA" is a clear geographical restriction that does not require further interpretation. In support of this argument, Blackwater cites the SOW, which states: "[t]his Statement of Work establishes the requirements for the instruction of Master at Arms Class 'A' School in the Norfolk Fleet Concentration Area (FCA)." AR 1550. The SOW then specifies that "[t]he training will be conducted in the Norfolk, VA, FCA." Id. Blackwater also points to the Navy's answer to a potential offeror's question about the location of the training, which was contained in Amendment 0003. It states that the "[c]ourse will be taught at the vendor's facility, which must be located in the Norfolk FCA, and within a one hour rush hour commute from NAS Oceana Annex Dam Neck." AR 254. A later amendment confirms that "it is highly desirable" for the contractor's facilities to be located within a one-hour driving distance from the student pick-up point of the FCA base but does not alter the SOW requirement that "training will be conducted in the Norfolk, VA, FCA." AR 1550, 1555. According to Blackwater, the Navy has described an "FCA" in the Chief of Naval Operations' Navy Ashore Vision 2030 as "an informal grouping of Navy installations within a Navy Region that are

in relatively close proximity (commuting distance) to each other and in the same metropolitan area such that they can capitalize on sharing capability." AR 2340.

The Court sees no inconsistencies in the Solicitation language requiring training to take place in the "Norfolk, VA, FCA" and finding it "highly desirable" that the contractor facilities be located within a one-hour driving distance of "NAS, Oceana Annex, Dam Neck." The Court agrees with Blackwater's interpretation that "the Norfolk, VA, FCA" encompasses an area greater in scope than a one-hour driving distance from the student pick-up point. Furthermore, one can harmonize the "Norfolk, VA, FCA" training requirement with the Solicitation language permitting live-fire training to occur "at a place geographically separate from the contractor's facilities." The MAA Class "A" School training program requires 33 days of instructional training, only seven of which would occur outside the classroom at a live-fire training range. AR 171-82. The Solicitation states that "training will occur within the Norfolk, VA, FCA," and the Navy later clarified that the "[c]ourse will be taught at the *vendor's facility*, which *must be located in the Norfolk FCA*." AR 254 (emphasis added). The Solicitation defines "facilities" separately from "ranges," which suggests that the Norfolk, VA, FCA training requirement applies only to courses taught at the vendor's facility. The SOW also contains a section on "Training Facilities," which describes the environmental standards required for *classroom* facilities as opposed to firing ranges. AR 1653. Based on the foregoing, the Court concludes that "facilities" refers exclusively to the site for classroom training. In a separate provision, the Solicitation requires the contractor to provide lunch "[i]n the event that 'live fire' evolutions take place *geographically separate from the contractor's facilities* . . . ." AR 13 (emphasis added). Live-fire training for the M-60 machine gun qualifies as a one-day "evolution" under the SOW. AR 1655. Taken together, the Court interprets the Norfolk, VA, FCA and the live-fire evolution provisions to mean that the contractor must provide in-classroom instructional training at the contractor's facilities within the Norfolk, VA, FCA but that it may conduct the seven days of live-fire training in a separate location.

In the absence of ambiguity in the Solicitation's terms, Blackwater has not waived its claim under Count I of the complaint. The essence of Blackwater's claim is that the Navy failed to comply with a material requirement in the Solicitation by accepting a proposal that did not provide M-60 live-fire training within the Norfolk, VA, FCA. Blackwater has never challenged the meaning of "Norfolk, VA, FCA." A term is ambiguous only "when [it] is susceptible to more than one reasonable interpretation." E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1341 (Fed. Cir. 2004) (citing Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir.1999)). Defendant has not proposed an alternative reasonable interpretation to the one offered by Blackwater above and, therefore, cannot create a patent ambiguity where one does not exist.

Even if some ambiguity does exist in the meaning of "Norfolk, VA FCA," the ambiguity is latent and does not compel Blackwater to challenge it prior to the close of the bidding process. The timeliness rule applies only to a patent ambiguity in a Solicitation, or one that is "obvious, gross [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." H&M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974). The Federal Circuit has explained the purpose of limiting the timeliness rule to patent ambiguities:

> While this court has invoked the patent ambiguity doctrine in appropriate cases, it has not given the doctrine broad application.  Because the doctrine has the effect of relieving the government from the consequences of its own poorly drafted contracts, the doctrine has been applied only to contract ambiguities that are judged so "patent and glaring" that it is unreasonable for a contractor not to discover and inquire about them . . . .  More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of *contra proferentum* [sic].

Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997) (citation omitted).  The Court declines to find any "obvious, gross [or] glaring" ambiguity in the term "Norfolk, VA, FCA."  At best, the term represents a latent ambiguity, which renders Defendant's and APT's timeliness argument unmeritorious.

C.  The Navy's Evaluation of APT's Proposed M-60 Firing Range Was Reasonable.

Blackwater bases much of its protest on the Navy's evaluation and acceptance of APT's proposal to use the Fort Pickett firing range for its M-60 machine gun training course.  Blackwater argues that the Navy acted arbitrarily and capriciously by awarding the contract to an offeror whose proposed M-60 firing range failed to comply with two material requirements in the Solicitation: (1) that training take place in the Norfolk, VA, FCA, and (2) that the offeror provide a letter of intent or agreement confirming its authorization to use any facilities owned by a third party.  Blackwater also asserts that the Navy deviated from the Solicitation's evaluation criteria in assessing APT's M-60 firing range.  Specifically, Blackwater alleges that the Navy failed to consider adequately in its technical evaluation of APT's proposal (1) the risk that APT would be bumped from the Government-owned firing range, or (2) the detrimental impact of the distance to the M-60 firing range on student training.  As explained below, the Court finds that Blackwater's protest grounds regarding APT's M-60 firing range proposal are without merit.

1.  Material requirements of the Solicitation

An offeror's proposal must conform to the terms of the Solicitation.  See Centech Group, Inc., 554 F.3d at 1038.  "To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals."  Id. (citing E.W. Bliss Co., 77 F.3d at 448).  In negotiated procurements, a proposal that fails to conform to the material terms of a solicitation is unacceptable, and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.  E.W. Bliss Co., 77 F.3d at 448 (citation omitted).  A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid.  See Centech Group, Inc., 554 F.3d at 1038 (concluding that the "Limitation on Subcontracting" clause was material because the mix of prime-subcontractor labor affected cost evaluation).  However, a court will only overturn an

agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious.  See E.W. Bliss Co., 77 F.3d at 448 (citing Keco Indus., Inc. v. United States, 492 F.2d 1200, 1204, 1206 (Ct. Cl. 1974)).  For the reasons stated below, the Court finds that the Navy reasonably determined that APT complied with the material terms of the Solicitation.

### a.  Norfolk, VA, FCA

Blackwater argues that the Navy improperly relaxed the "Norfolk, VA, FCA" geographical restriction on the MAA Class "A" training program when it accepted APT's proposal to use the Fort Pickett M-60 firing range in Blackstone, Virginia.  Blackwater alleges that the "Norfolk, VA, FCA" term is a material requirement mandating that all training take place within the Norfolk, VA, FCA, and Fort Pickett's location does not meet that requirement.  Accordingly, Blackwater asserts that the Navy violated applicable procurement law when it accepted a proposal that failed to comply with the material requirements of the Solicitation.

As a threshold matter, there is no dispute that the "Norfolk, VA, FCA" term is a material requirement because it affects the price and delivery of the services requested in the Solicitation. See, e.g., Blount, Inc., 22 Cl. Ct. at 228.  The question presented is what training must take place within the Norfolk, VA, FCA.  Blackwater argues that the Solicitation *requires all* training to occur within the Norfolk, VA, FCA and *expresses a preference* that *all* training be conducted within a one-hour drive of the student pickup point.  Defendant and APT counter that the Norfolk, VA, FCA training requirement applies only to training conducted at the contractor's facilities and creates an exception for live-fire training.  They also emphasize that there is no evidence in the record proving that APT's proposed live-fire training range falls outside the Norfolk, VA, FCA because the Solicitation does not define this term.

The Court concludes that the Navy reasonably interpreted the "Norfolk, VA, FCA" geographical restriction as carving out an exception for a one-day field trip for the M-60 live-fire training course.  The Navy clarified the requirement that "[t]raining will be conducted in the Norfolk, VA, FCA" with the explanation that the course would take place at the "vendor's facility" located in the Norfolk, VA, FCA.  AR 5, 254.  Furthermore, the Solicitation specifically provides that "live fire" training may take place at a location "geographically separate" from the "contractor's facilities." AR 13.  The Solicitation also defines "facilities" separately from "ranges," which suggests that the Norfolk, VA, FCA training requirement applies only to courses taught at the vendor's facility.  The Court finds no inconsistencies in the Navy's interpretation of the Solicitation language as requiring the contractor to provide in-classroom instructional training at the "contractor's facilities" within the Norfolk, VA, FCA but allowing it to conduct the seven days of live-fire training in a "geographically separate" location, even if it is outside the FCA.  This interpretation comports with the "turn-key" nature of the training program, which requires the contractor to provide all of the facilities, transportation, and food necessary to support the students.  The Navy's determination that APT's bid satisfied the "Norfolk, VA, FCA" requirement was not arbitrary and capricious, and therefore, the Court will not disturb it.  See E.W. Bliss Co., 77 F.3d at 448.

-20-

Even if the Navy erred in selecting an offeror who did not comply with a material Solicitation requirement, Blackwater has failed to show that it has suffered prejudice as a result. To prevail in a bid protest, a protestor must show "significant, prejudicial error in the procurement process." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citations omitted). To show prejudice, the protestor must demonstrate that, but for the error, there was a substantial chance that it would have received the award. Statistica, Inc., 102 F.3d at 1582. Blackwater argues that it was prejudiced by the Navy's decision to award APT the contract because (1) an unqualified bidder remained in the competition, and (2) Blackwater would have reduced its proposal price if it had known that live-fire training could have taken place outside the Norfolk, VA, FCA. However, Blackwater proposed to provide all training at its own facilities located in Moyock, North Carolina and does not assert that it would have proposed a different training facility or otherwise modified its proposal. Accordingly, the Court declines to find any prejudice to Blackwater as a result of the Navy's interpretation of the "Norfolk, VA, FCA" requirement.

### b. Letter of Agreement

Blackwater argues that the Navy violated the terms of the Solicitation by accepting APT's proposal despite APT's failure to provide a letter of agreement or contract confirming its authorization to use the Fort Pickett firing range. The Solicitation requires the offeror to "[p]rovide a plan for obtaining the use of the necessary ranges/classroom . . . ." AR 1701-02. Accompanying that plan, the offeror must include "Letters of Agreement or contracts with the offeror and the proposed range . . . ." Id. The Solicitation also states that "[a] letter of intent or actual agreement for use of ranges and classrooms not owned by the contractor shall be provided . . . prior to [the Navy Occupational Safe and Health Officer's] inspection of the ranges," which must occur "by the end of the mobilization phase . . . ." AR 1656. The Solicitation does not define a "letter of intent or actual agreement" or "Letters of Agreement or contracts," nor does it specify any standards for determining the proper level of documentation required.

In its May 29, 2008 proposal revision to use the Fort Pickett firing range, APT provided the following documentation to prove Fort Pickett's availability for training: a Request for Training Support that APT had submitted to Fort Pickett (AR 1763-66); an email correspondence from LTC Weisnicht, Chief, Plans, Training and Security Division at Fort Pickett to APT official Walter T. Brown stating, "**We have open ranges here every day**. National Emergencies, deployments, have priority and could mean bumping . . . ." (AR 1767) (emphasis in original); and a Memorandum from LTC Weisnicht to Mr. Brown confirming that "[i]n accordance with the provisions of [Army Regulation] 385-63 and DA Pam 385-63, APT-LLC is authorized to schedule the use of Fort Pickett's M-60 Qualification Range (Range 19) in conjunction with your company's duties and responsibilities to train Sailors as required under Navy contract N61339-08-D-0002." (AR 1769).

Blackwater contends that this documentation does not satisfy the material requirement that the offeror provide a "letter of intent or actual agreement" because LTC Weisnicht did not have the authority to enter into agreements governing the use of Army real estate. Blackwater claims that

Department of the Army Pamphlet ("DA Pam") 385-63 requires requests for use of Army ranges to be "coordinated with the installation range control office, safety office, and the Judge Advocate General (TJAG), and submitted to the installation commander for approval," and APT failed to seek approval of Fort Pickett's installation commander. AR 2458. However, the Court finds no evidence to indicate that LTC Weisnicht did not have the power to authorize APT's use of the facility. Fort Pickett's regulations state that the Director of Plans, Training and Security, the position LTC Weisnicht held, serves as the overall coordinator of the facility. AR 2690. Furthermore, LTC Weisnicht's Memorandum specifically stated that his act of authorizing APT's use of the firing range complied with DA Pam 385-63.

Blackwater further maintains that LTC Weisnicht's Memorandum contained insufficient information to constitute a letter of agreement under the Solicitation. Blackwater argues that DA Pam 385-63 requires an agreement authorizing use of a Government-owned range by a nonmilitary organization to detail the "rights and responsibilities of each party, liabilities, procedures, and regulatory and procedural requirements," which LTC Weisnicht's Memorandum did not. AR 2458. However, noncompliance with DA Pam 385-63 is not a grounds on which Blackwater can assert that the contract award was "not in accordance with the law" because a Department of Army Pamphlet does not constitute a "regulation or procedure." See Impresa, 238 F.3d at 1332 (citations omitted). Furthermore, the Solicitation did not incorporate DA Pam 385-63 or Army Regulation 385-63 in its list of applicable documents, and therefore, they do not make up material requirements that an offeror must meet.

The Navy reasonably determined that the documents APT submitted to confirm its authorization to use Fort Pickett met the Solicitation requirements. Courts will only overturn an agency's finding that a bid satisfied the material requirements of a solicitation if such a finding was arbitrary and capricious. See E.W. Bliss Co., 77 F.3d at 448 (citation omitted). In the present case, the Solicitation required APT to provide along with its proposal a "plan for obtaining the use" of the firing range and any "Letters of Agreement or contracts . . . ." AR 1701-02. The Solicitation did not ask for a "letter of intent or actual agreement" until the end of the mobilization phase. AR 1656. Moreover, the Solicitation does not define any of these terms. Blackwater has failed to cite any language in the Solicitation suggesting that LTC Weisnicht's memorandum, which expressly referenced the contract at issue and APT's responsibilities thereunder, does not satisfy the Solicitation requirements. Both the SSEB and the SSA reviewed the documentation provided by APT and concluded that APT provided sufficient assurance that the military range would be available for M-60 training. AR 1830, 1864-65. Blackwater counters that the SSA based its decision on the erroneous belief that APT had proposed a backup range in the event that Fort Pickett was not available. However, the SSA later submitted a written declaration to the GAO disclosing this error and confirming that the misunderstanding was "immaterial and would not have changed [his] source selection decision." AR 1949. The Navy reasonably concluded that APT had provided sufficient documentation authorizing its use of the Fort Pickett firing range, and this Court will not substitute its judgment for that of the agency so long as the decision is reasonable. Benchmade Knife Co., Inc., 79 Fed. Cl. at 735 (quoting R & W Flamman GmbH, 339 F.3d at 1322).

2. <u>APT's technical ratings</u>

Blackwater argues that the Navy failed to follow the Solicitation evaluation criteria when it performed its technical evaluation of APT's proposal to use Fort Pickett for its M-60 firing range. The Solicitation provides that an offeror's technical proposal would be evaluated based on three factors: (1) Technical Understanding, (2) Technical Capability, and (3) Management/Management Structure. AR 67-69. Each proposal would receive a Technical Merit Adjectival Rating and a Proposal Risk Rating for each factor. AR 71. The Navy awarded both Blackwater's and APT's proposals a combined "Highly Satisfactory/Low Risk" adjectival and risk rating in the Technical/Management area. Blackwater asserts that the Navy (1) improperly minimized the risk that APT would be bumped from the M-60 firing range at Fort Pickett by higher-priority users, and (2) failed to consider adequately the impact that the distance between the student pick-up point and Fort Pickett would have on the MAA training program.

Whether a proposal has "adequately demonstrated" compliance with solicitation requirements represents "the sort[] of judgment[] that receive[s] the greatest deference possible." <u>Fort Carson Support Servs. v. United States</u>, 71 Fed. Cl. 571, 598 (2006) (citing <u>E.W. Bliss Co.</u>, 77 F.3d at 449). The Court finds that the Navy has shown a rational basis for APT's technical rating regarding both the risk of bumping and the impact of the long commute on student training. In light of the deference afforded to an agency's technical ratings, this Court will not set aside the Navy's reasonable evaluation of APT's technical proposal.

a. Risk of bumping

With regard to the contention that the Navy failed to consider adequately the risk of bumping, Blackwater emphasizes that Fort Pickett's policies and procedures prohibit training requests made fewer than ten days or more than 365 days in advance, and that Fort Pickett only accepts training requests made fewer than 60 days in advance on a case-by-case basis. AR 2692. Blackwater contends that these time restrictions would impede APT's ability to schedule M-60 live-fire training. In addition, Blackwater points to a Fort Pickett policy that sets forth a hierarchy of user priority from highest to lowest: (1) National Guard ("NG")/Reserve Component ("RC") units undergoing Soldier Readiness Program or Mobilization; (2) NG/RC units undergoing External Evaluations; (3) NG/RC units conducting Annual Training; (4) NG/RC units conducting Inactive Duty Training; (5) Other Army Components; (6) other Department of Defense elements; and (7) all other organizations on a space available basis. <u>Id.</u> Blackwater maintains that APT's status as a commercial contractor drops it into the lowest priority category, and therefore APT would only have access to the facility on a space available basis. Blackwater argues that the Navy failed to take these policies into account in its technical evaluation of APT's proposal, which was arbitrary and capricious.

The Solicitation's technical evaluation criteria required the Navy to assess the risks associated with an offeror's proposal according to three factors. AR 67-69. Under the Technical Understanding Factor, the Program Risk subfactor directs offerors to "[i]dentify potential problems/pitfalls associated with this effort and describe specific actions of how the offeror intends

to minimize their impact." AR 59. The Solicitation states that the Navy would evaluate an offeror's identification of potential problems/pitfalls and the specific actions the offeror intended to take to minimize their impact by comparing "the problems/pitfalls against real-life situations to assess the offeror's understanding of the complexities associated with the requirement." AR 67-68. With respect to the Technical Capability factor, the Solicitation required the offeror to provide a mobilization plan describing how the offeror intended to become fully operational prior to the commencement of training. AR 59. Among other things, the plan had to address the offeror's hiring strategy for obtaining qualified personnel, when the personnel would be trained and available to work, how the offeror would mitigate risk to insure the required workforce would be onsite on the contract performance date, the offeror's plan for holding status reports prior to the contract performance date, and a schedule detailing when significant phase-in activities would occur. Id. In evaluating the mobilization plan, the Navy would consider the contractor's available resources and the plan's comprehensiveness and efficiency. AR 68.

The Navy's technical evaluation of APT's proposal reasonably considered the bumping risk posed by a Government-owned firing range. In its May 29, 2008 proposal revision in which it proposed the Fort Pickett location for M-60 training, APT included written assurances from LTC Weisnicht that Fort Pickett had "open ranges here every day." AR 1767. LTC Weisnicht also responded to an email from an APT official confirming the official's understanding that "as long as [APT's] training staff [did] not insist on being booked on a particular range, getting a range that [was] capable of satisfying [its] machine gun qualification requirements [would] not be a problem. Since there are several ranges on Fort Pickett that can be used for this type of training, the chance of being 'bumped' [was] negligible and should not be a concern." AR 1767-68. The SSEB reviewed this information and found that APT had "an excellent understanding of the course, currently [had] on staff all of the required instructors, and [had] *obtained all of the other required resources necessary to teach the course*." AR 1827 (emphasis added). The SSEB concluded that the "features presented in the technical proposal [had] *little or no potential to cause disruption of schedule, increase in cost, or degradation of performance*. Normal contractor effort [would] probably be able to overcome difficulties." Id. (emphasis added). The SSEB even acknowledged that Blackwater's proposal had a "slight relative advantage" over APT's because Blackwater did not face the risk of bumping but ultimately determined that both proposals warranted a "Highly Satisfactory/Low" risk rating because each proposal offered benefits that exceeded the Government's requirements and demonstrated the same number of unique strengths. AR 1852-54. The SSEB's analysis comports with the definition of "Low" risk, which means that the proposal had "little or no potential to cause disruption of schedule, increase in cost, or degradation of performance." AR 71. Accordingly, the Court finds that the SSEB properly evaluated APT's technical proposal because it weighed the bumping risk and concluded that APT's documentation addressed it. Blackwater's argument that the Navy did not *adequately* consider the bumping risk in light of Fort Pickett's policies and procedures merely amounts to a disagreement with the Navy's judgment, and the Court will not disturb the Navy's technical rating absent a showing of arbitrary or capricious conduct. See, e.g., Fort Carson Support Servs., 71 Fed. Cl. at 598 (citation omitted).

Blackwater asserts that the SSA relied on incorrect information regarding APT's M-60 firing range proposal that inflated APT's technical rating. In his August 1, 2008 Source Selection Decision Memorandum, the SSA erroneously stated that APT had proposed a backup range in the event that Fort Pickett was not available, and found that the risk of bumping was "low given APT's proposed back-up plan." AR 1864. However, after the SSA discovered that this assumption was in error, he submitted a written declaration to the GAO stating that "[n]otwithstanding my erroneous reference to APT using . . . a backup plan, the Low proposal risk ratings for Factor 2 [technical capability] and Area A [Technical/Management] would remain unchanged for APT's proposal." AR 1949. The SSA further stated:

> The noted Mobilization and M60 Live Fire Training Back-up Plan issues would not have changed APT's technical merit or proposal risk ratings. The SSDM . . . notes that Blackwater's Technical/Management proposal has a slight relative advantage over APT, in that Blackwater does not have any risk of being bumped from any range since they own their own ranges . . . . I still find this statement to be true. APT will accomplish all of the required training at its single site (that is also within the "highly desirable" one hour driving distance) with the exception of the M60 live fire training. The M60 live fire training makes up one day in the thirty-three day MAA course. APT has proposed an acceptable training solution for the M60 live fire training. The above noted misstatement of benefits and/or risk attributed to APT's proposal, as stated in the SSDM, was immaterial and would not have changed my source selection decision.

Id. The SSA reviewed the documentation APT provided in its final proposal revision and concluded that the risk of bumping was negligible because the documents confirmed that APT would only be bumped in the event of a national emergency or deployment, and Fort Pickett had multiple ranges available for use on a daily basis. AR 1948. Blackwater's mere disagreement with the Navy's technical rating does not constitute grounds for overturning the contract award. See, e.g., E.W. Bliss Co., 77 F.3d at 449.

b. Commute to Fort Pickett

Blackwater also argues that the Navy improperly evaluated APT's technical proposal by failing to consider adequately the impact of Fort Pickett's distance from the student pick-up point for the MAA course. APT's proposal to use Fort Pickett for M-60 live-fire training required a 2-1/2 hour commute each way from the student pick-up point and allowed for fewer than six hours of on site training. Blackwater alleges that the Navy acted arbitrarily and capriciously in assigning Blackwater and APT the same "Highly Satisfactory/Low Risk" rating and declining to downgrade APT for the significant travel time.

The Solicitation contains language governing the hours and location of training for the MAA course.  It states that "[i]t is highly desirable that contractor facilities are located within one-hour driving distance from the main gates or student pick-up point of the FCA base."  AR 1555-56.  As explained above, the Court has concluded that the Navy reasonably interpreted this preference to apply only to the offeror's classroom facilities and not the live-fire training range.  The Solicitation also provides that:

> [t]raining shall normally be conducted eight hours a day (early, evening, or night shift), five days a week for the length of the course.  These eight hours are actual training time, and should not include meals.  However, the daily activity may range from 9 to 12 hours or more if required to meet all training objectives outlined in the curriculum.  Student remediation is required and should be considered beyond the normal 8 hour training time for each class.  During the execution of the class schedule where holidays or any other event that impacts the expeditious movement of Sailors through the training pipeline occurs, the training activity may extend the number of daily training hours to compensate.

AR 1554.  Through this language, the Navy expressed a preference that actual training time account for eight hours a day but allowed for the possibility that daily activity extend up to twelve hours to account for food and transportation.

The Navy reasonably concluded that APT's technical proposal met these location and hour specifications.  APT initially proposed the A.P. Hill firing range, which was located 147 miles, or a three hour drive, from the student pick-up point.  AR 1738.  The Navy sent APT an Evaluation Notice expressing concerns that A.P. Hill fell "significantly outside the 'highly desirable' parameter" because "the travel distance . . . [could] cause unnecessary fatigue and lack of attention to detail while on the firing line . . . ."  Id.  APT modified its proposal to address these concerns and selected Fort Pickett as its new M-60 firing range location.  AR 1759.  APT also submitted an itinerary for the M-60 live-fire training day in which total training and travel time would not exceed twelve hours.  AR 1760-61.  The breakout schedule provided that instructors would review topics previously taught in the classroom during the commute to the range, students would receive five and-a-half hours of live-fire training at the range, and instructors would reflect on the firing range training during the commute back to the pick-up point.  Id.  The SSEB evaluated APT's technical proposal and noted that the range "still [fell] outside the 'highly desirable' parameter of one (1) hour driving distance . . . ."  AR 1829.  However, the SSEB reasoned that, "[a]lthough not optimal, according to the schedule provided by the offeror, the M60 live fire training and related travel can be accomplished within the 12 hours as stated in paragraph 3.7 of the SOW."  AR 1830.  The SSEB also emphasized that the M-60 live-fire training course made up only one day of a 33 day course, 32 of which APT proposed to teach within the one hour "highly desirable" drive time.  AR 1852.  Finally, it concluded that APT had "provided a plan that mitigate[d] the risk associated with the extended drive time by providing a breakout of the activities for the one day of M60 live fire training."  Id.  Based on this evaluation, the SSEB awarded APT a technical rating of "Highly Satisfactory/Low," the same rating

it gave Blackwater. AR 1829. The Court finds that the SSEB reasonably concluded that APT had taken actions to mitigate concerns about Fort Pickett's location, and therefore, it had a rational basis for awarding APT the same technical rating as Blackwater.

The SSA also properly evaluated APT's technical proposal to account for Fort Pickett's location. The SSA expressly considered the difference between Blackwater's and APT's proposals regarding their M-60 firing range locations and stated:

> Therefore the relative difference between the technical proposals lies in the unique strengths, of which APT has three and Blackwater has three. Two of Blackwater's unique strengths are that the training facility provides all requirements at a single site and the facility is within the "highly desirable" 60 minute driving distance. However, APT also provides all requirements at a single site that is within the highly desirable driving distance, with the exception of the M60 firing range . . . . Regarding the different proposed approaches by APT and Blackwater for meeting the M60 live fire training requirements, the M60 live fire training comprises only one day of the 33 day training course and, *although long, that single training day still falls within the RFP allowable 12 hour training day time frame.*

AR 1864 (emphasis added). The SSA concluded that "the two technical approaches [were] relatively the same, but for the exception of one day of M60 training." AR 1864-65. The SSA had the discretion to determine that APT had mitigated the Navy's concerns about Fort Pickett's location because the proposed itinerary fell within the twelve hour time limit, and the one-hour "highly desirable" drive time merely expressed a preference and not a requirement. Whether APT's proposal *adequately* met the Solicitation requirements related to training location is just "the sort[] of judgment[] that receive[s] the greatest deference possible." See Fort Carson Support Servs., 71 Fed. Cl. at 598 (citing E.W. Bliss Co., 77 F.3d at 449). The Navy weighed the weakness associated with the commute to Fort Pickett and determined that it did not outweigh the eleven technical strengths in APT's favor. This Court affords deference to the Navy's technical rating and will not disturb it in light of the agency's reasonable evaluation. See, e.g., E.W. Bliss Co., 77 F.3d at 449.

D. The Navy Properly Evaluated APT's Past Performance.

Blackwater alleges that the Navy improperly evaluated APT's past performance record by failing to downgrade APT's rating for past safety incidents and accepting insufficient documentation to prove that APT had mitigated these concerns. For the reasons stated below, the Court concludes that the Navy conducted a reasonable evaluation of APT's past performance and finds no grounds for disturbing the Navy's past performance rating.

1. APT's overall past performance rating

Blackwater asserts that the Navy failed to consider adequately APT's past performance rating based on three past safety incidents: (1) an explosive mishap of a 12-gauge shotgun in March 2005; (2) the discharge of a 9mm round during a classroom training demonstration in May 2007; and (3) the submission of a Training Observation Report by an officer with the Center for Security Forces questioning the maintenance of M-60 medium machine guns used by APT. AR 1131.

The Solicitation requires the Navy to assign each offeror a Performance Risk Rating based on the offeror's performance on contracts currently ongoing or completed within the past three years for similar products or services. AR 71. In the present case, the Navy ultimately assigned APT a Low risk rating, meaning that "little doubt exist[ed] that the offeror [would] successfully perform the required effort." AR 72. The Navy assigned Blackwater a Very Low risk rating, meaning that "essentially no doubt exist[ed] that the offeror [would] successfully perform the required effort." Id.

The Court finds that the Navy reasonably rated APT's past performance by reviewing APT's safety record, requesting additional information regarding past safety concerns, and factoring that information into its evaluation. The Navy initially assigned APT a Moderate past performance rating based on the three safety incidents above. AR 1833. After the PCO informed APT of his concerns in an Evaluation Notice, APT responded by providing a list of sixteen existing safety policies, checklists, and procedures and new steps taken to prevent future safety violations. AR 1189-91. The SSEB reviewed this information and determined that "little doubt" existed about APT's ability to perform the contract. AR 1833. Accordingly, the SSEB upgraded APT from a Moderate to a Low past performance rating. AR 1832-33. The SSA considered the SSEB's decision and concluded that "the magnitude of difference between the past performance ratings is not appreciable, since APT is the incumbent contractor currently performing the MMA course, and its proposal and response to discussions reflect systemic improvements to resolve the quality and safety concerns with its past performance." AR 1865. The Solicitation makes clear that the Navy did "not expect an offeror's past performance to be perfect" so long as the offeror "demonstrate[d] the ability to isolate past and present problems down to a root cause and to take systemic improvement management actions to resolve the root cause of the problems." AR 70. The Navy determined that APT had instituted policies and procedures to "resolve the root cause" of its safety problems, and this Court will not disturb that reasonable judgment. See Benchmade Knife Co., Inc., 79 Fed. Cl. at 735.

2. Documentation of safety improvements

Blackwater asserts that the Navy improperly evaluated APT's past performance record by accepting insufficient documentation from APT in response to concerns about its prior safety violations. Blackwater argues that the Solicitation required offerors to:

> [d]escribe any application of systemic improvement management practices by presenting the root cause of the performance problem, and

-28-

the corrective actions taken or being taken to resolve past and present performance problems. Provide a synopsis of the percentage of time that performance did not meet specification and/or customer expectations; or products were delivered late. Include the reasons why specifications and/or customer expectations were not met and the systemic improvement actions taken to prevent further occurrences . . . . Corrective action effectiveness of past problems or lack of effective corrective actions shall be included.

AR 62. According to Blackwater, there is no evidence that APT investigated the circumstances of each safety violation, identified the root cause, or changed its policies and procedures to prevent such incidents from occurring again as required by the Solicitation. Rather, APT merely provided information addressing existing policies and procedures, including "checklists, plans, and reports in place to address all types of situations that may occur." AR 1832. Blackwater therefore alleges that the SSA erroneously concluded that APT had strengthened its safety policies and procedures in response to the safety incidents when it had not.

Blackwater misstates the Solicitation requirements related to past performance and APT's response to them. The Solicitation required offerors to include in each past performance proposal a minimum of three and a maximum of seven previous or ongoing contracts as references. AR 61. Each contract had to provide information on nine topics, only one of which Blackwater references above. These include: (1) the contract number and award date, (2) the procuring agency, (3) contact information for the procuring officer, (4) the type of contract, (5) the period of performance, (6) a brief description of the contract, (7) the relevancy of the contract, (8) any application of systemic improvement management practices, as described by Blackwater above, and (9) any other information important to the contractor's past performance. AR 61-62. APT's proposal responded to each of these nine items, including the "systemic improvement" item. AR 704-28. Based on this information, the Navy concluded that APT had sufficiently "proved" its "level of meeting customer satisfaction and systemic improvement." AR 857. When the Navy issued Evaluation Notices to APT regarding its past performance, the Navy asked APT to "provide information that addresses systemic improvement plans to ensure that *policies and procedures are in place* to mitigate safety risks, ensure proper maintenance of weapons, ensure instructors meet all required qualifications regarding safety and maintenance, and provide for timely reporting of mishaps to the Government." AR 1131 (emphasis added). The Navy did not seek information regarding a "root cause analysis." Id. APT complied with this request in its August 24, 2007 response to the Navy's Evaluation Notices by disclosing sixteen existing safety-related policies, procedures, and checklists and specific steps it had taken to address the three safety incidents of concern. AR 1189-92.

Blackwater's argument that APT merely provided documentation of existing safety policies and procedures does not comport with the record. After receiving the Navy's Evaluation Notices, APT informed the Navy that it had adopted several new safety procedures and policies in response to the three safety violations. Following the March 2005 explosive mishap, APT (1) conducted an internal investigation and determined that the incident resulted from defective ammunition, (2)

reported the problem to the ammunition manufacturer and received assurances that it would implement stricter quality, (3) began testing all ammunition prior to allowing students to shoot, and (4) set a goal of reporting any firing mishap to the Training Site Manager within fifteen minutes. AR 1191. In response to the May 2007 ammunition discharge, APT instituted a policy prohibiting instructors from carrying functional weapons or ammunition outside the firing range. Id. Finally, APT arranged for its employees to obtain additional training to bring its future maintenance practices into compliance with manufacturer specifications in response to the Navy's concerns about its M-60 maintenance practices. Id.

Furthermore, Blackwater has mischaracterized the SSA's discussion of APT's sixteen existing safety policies and procedures. In the first Source Selection Decision Memorandum, the SSA stated that, "[t]hrough discussions, the offeror *expanded on* its policies and procedures for the proper maintenance of weapons, ensuring instructors meet all required qualifications, and their plan for the timely reporting of any mishaps to the government." AR 1334 (emphasis added). The final Source Selection Decision Memorandum likewise disclosed that, in response to the safety incidents, "APT *consequently expanded on* its policies and procedures for the proper maintenance of weapons and instructor safety." AR 1859 (emphasis added). These memoranda indicate that the Navy held discussions with APT that induced the offeror to strengthen and improve its existing safety policies and procedures. Based on the concrete steps APT took to prevent future safety violations, the Navy reasonably concluded that APT had demonstrated "systemic improvement" of its safety record. This Court affords deference to the Navy's assignment of past performance ratings, see, e.g., Gulf Group Inc., 61 Fed. at 351 (citations omitted), and will not substitute its own judgment for that of the agency where APT acknowledged past performance issues and took steps to correct them, see J.W.K. Int'l Corp. v. United States, 49 Fed. Cl. 371, 392 (2001) (citations omitted).

E. The SSA's Best Value Determination Was Reasonable.

Blackwater alleges that the SSA conducted an improper best value determination by downplaying Blackwater's technical superiority in relation to APT's and according more weight to price than the Solicitation permitted. Blackwater argues that the Navy essentially awarded the contract based upon a technically-acceptable, low-price analysis. Blackwater asserts that the SSA erroneously relied on the SSEB's flawed evaluations of APT's technical and past performance ratings and inflated APT's unique strengths over Blackwater's in making its best value determination.

Contracting agencies must evaluate competitive proposals "based solely on the factors specified in the solicitation" and treat all offerors equally. 10 U.S.C. § 2305(b)(1) (2006). An agency's final award decision must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. To determine whether and to what extent meaningful differences exist between proposals, the agency should consider both adjectival ratings and information on the proposals' advantages and disadvantages. See Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617, 640-41 (2002). Courts should look beyond the adjectival ratings

because proposals awarded the same adjectival ratings are not necessarily equal in quality.  Id. at 641.

Procurement officials have substantial discretion to determine which proposal represents the best value for the Government.  E.W. Bliss Co., 77 F.3d at 449 (citations omitted).  The FAR describes the "best value determination" as a trade-off process: "A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR 15.101-1(a).  An agency has the discretion to select a lower-priced, lower-technically-rated proposal if it decides that the higher price of a higher-technically-rated proposal is not justified, even if the solicitation emphasizes the importance of technical merit.  Banknote Corp., 56 Fed. Cl. at 390 (citation omitted).  Where agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award.  See E.W. Bliss Co., 77 F.3d at 449.  An agency demonstrates proper exercise of discretion so long as it documents its final award decision and includes the rationale for any business judgments and tradeoffs made.  See FAR 15.308.  Mere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious.  Banknote Corp., 56 Fed. Cl. at 384 (citation omitted); ABA Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 409 n.13 (2003) (citation omitted).

In the present case, the Solicitation directs the Government to "select a responsible offeror whose proposal, conforming to the solicitation, is most advantageous to the Government, price and other factors considered."  AR 210.  It further states that "Technical/Management is significantly more important than Past Performance, and Past Performance is more important than Price." Id.  The SSEB assigned both Blackwater and APT technical adjectival ratings of "Highly Satisfactory."  AR 1827, 1834.  Despite the identical ratings, the SSEB noted that Blackwater's proposal had a "slight relative advantage" over APT's because Blackwater did not pose a risk of being bumped from a firing range, and the live-fire training would occur within the "highly desirable" one-hour driving distance from the student pick-up point.  AR 1852.  With respect to past performance, the SSEB awarded Blackwater a superior past performance risk of "Very Low" compared to APT's rating of "Low." Id.  However, the SSEB emphasized that APT had mitigated the Navy's concerns about two safety incidents that had led to its Low past performance rating– the accidental discharge of the 9mm round and the incident in which suppressors came off the barrel of an M-60 machine gun– by adopting new safety policies and procedures. Id.  APT argues that the Navy's decision not to explicitly address the explosive mishap with the 12-gauge shotgun demonstrates that the SSEB failed to consider fully APT's safety record.  To the contrary, the SSEB's report did address the shotgun incident in the past performance area summary of APT's proposal and determined that APT had resolved any safety concerns by testing all ammunition prior to allowing students to shoot and receiving the manufacturer's assurances that it would adopt stricter quality controls.  AR 1832-33. The SSA then incorporated the SSEB's analysis by reference.  AR 1857.  Finally, Blackwater offered a price of $22,195,142.34, which was approximately 10 percent higher than APT's price of $20,179,016. Id.  The SSEB considered the three evaluation areas and concluded that "[o]n a best

value basis, APT's proposed price advantage would out weigh [sic] Blackwater's slight relative advantage regarding the M60 range and the difference in past performance." Id.

In affirming the SSEB's recommendation to award the contract to APT, the SSA acknowledged that Blackwater and APT had earned the same rating in the Technical/Management area and that the two proposals shared eight common strengths and each possessed three unique strengths. AR 1863-64. The SSA then analyzed two of Blackwater's three unique strengths: its ability to provide all live-fire training at a single site and within the "highly desirable" 60 minute driving distance. AR 1864. The SSA explained that APT also had provided all training requirements at a single site within the "highly desirable" driving distance with the exception of the M-60 training. Id. The SSA added that Blackwater's third unique strength was notable but did not "provide a clear advantage to either offeror because they do not carry that much added value." AR 1865. In conducting the best value determination, the SSA concluded that Blackwater's Technical/Management proposal had only a "slight relative advantage" regarding the M-60 range even though Blackwater's past performance rating was higher than APT's because "the magnitude of difference between [them] is not appreciable, since APT is the incumbent contractor currently performing the MAA course, and its proposal and response to discussions reflect systemic improvements to resolve the quality and safety concerns with its past performance." Id. The SSA concurred with APT's "Low" past performance risk rating but considered it to be near a "Very Low" rating. Id. Furthermore, the SSA agreed that the substantial price advantage of APT's proposal more than outweighed the slight difference in the Technical/Management proposals and the minor difference in past performance risk because the long, single day of M-60 live-fire training would not greatly inconvenience students so as to offset the significant price difference between the proposals. Id.

The SSA's tradeoff analysis reasonably considered the relative merits of APT's and Blackwater's proposals. With respect to Plaintiff's allegation that the SSA improperly downplayed Blackwater's unique strengths, the Court finds nothing arbitrary and capricious in the SSA's determination that Blackwater's proposal had only a "slight relative advantage" regarding the M-60 firing range. The Navy awarded both offerors the same technical adjectival rating of Highly Satisfactory. AR 1827, 1834. The SSA then made a business judgment that any disadvantage APT's M-60 firing range proposal had due to distance or risk of bumping was small because the M-60 live-fire training made up only one day in a 33 day training course. This Court will not disturb an agency's best value decision merely because a disappointed bidder disagrees with the agency's analysis. See E.W. Bliss Co., 77 F.3d at 449.

The Court also disagrees with Plaintiff that the SSA downplayed Blackwater's technical proposal regarding its management experience and instructor qualifications by failing to designate these qualities as strengths. Blackwater's management personnel may have had two years or more of "like or similar training," but the SSA was entitled to make the business judgment that APT's management personnel had superior experience based on APT's status as the incumbent contractor. AR 1864. Likewise, the SSA had the discretion to determine that APT's corps of instructors, all of whom were certified in and had previously taught the MAA course, provided a unique strength that

Blackwater's instructors did not possess because only a portion of them had proper certification. The law does not require the SSA to conduct an identical analysis of APT's unique strengths, as Plaintiff suggests. Rather, it only compels the SSA to determine whether Blackwater's unique strengths warranted the premium represented by its higher-priced proposal.

Based upon the above analysis, the Court finds that the Navy's best value determination in selecting APT for contract award was reasonable, in compliance with the Solicitation's evaluation criteria, and otherwise in accordance with law.

<u>Conclusion</u>

For the foregoing reasons, Defendant's and Defendant-Intervenor's motions for judgment on the Administrative Record are GRANTED, and Plaintiff's cross-motion for judgment on the Administrative Record is DENIED. The Clerk shall enter judgment for Defendant. No costs.

On or before April 15, 2009, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential or other protected information and submit to the Court proposed redactions, if any, before the opinion is released for publication.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge